# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
)
ANITA CREVIER,                                              )
)
      **Plaintiff,**                                              )
)     **Civil Action No.**
      **v.**                                                      )     **05-40184-FDS**
)
**TOWN OF SPENCER, CARTER**                    )
**TERENZINI, and H. WARRAN RAMSEY,**    )
)
      **Defendants.**                                          )
)
_____

## MEMORANDUM AND ORDER ON
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is an action by a disabled employee alleging failure to accommodate, interference

with right to leave, and unlawful retaliation.  Plaintiff Anita Crevier suffers from Crohn's disease,

a chronic inflammation and ulceration of the lower gastrointestinal tract.  She alleges that her

former employer, the Town of Spencer, failed to grant her medical leave in accordance with the

federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 *et. seq.*, and ultimately

discharged her due to her disability in violation of the Americans with Disabilities Act ("ADA"),

42 U.S.C. § 12101, *et. seq.*, and Massachusetts law.

The complaint contains nine counts and names three defendants:  the Town of Spencer,

Carter Terenzini, and H. Warran Ramsey.  All counts against defendants Terenzini and Ramsey

were dismissed in January 2007 for untimely service of process.  The Town of Spencer has moved

for summary judgment on the remaining counts.  For the following reasons, the motion for

summary judgment will be granted in part and denied in part.

I.      **Background**

The facts are described in the light most favorable to the plaintiff.

Anita Crevier began working for the Town of Spencer Water Department in 1978.  She

served in a clerical/secretarial position, with duties that included customer service, answering the

telephone, typing, preparing water bills, and working on the annual budget.

Crevier was diagnosed with Crohn's disease in 1990.[1]  She does not dispute that the Town

made reasonable accommodations for her illness until 1999.  That year, a new Town

Administrator, Carter Terenzini, was appointed.  In 2000, Warran Ramsey became superintendent

of the Water Department.[2]  Crevier contends that soon thereafter, Terenzini and Ramsey began a

pattern of discrimination against her based on her medical condition.

In 2000, Crevier began to be absent from work for substantial periods of time, due

primarily to problems related to her disease.  From June through September 2000, the Town

granted her a medical leave of absence because she required surgery and hospitalization.  The

Town asserts that she was absent for 30 weeks in 2000.  In January 2001, her schedule was

reduced to 32 hours per week for budgetary reasons; she was absent for 10 additional weeks that

year.[3]  She used a combination of sick, personal, and vacation time that she had earned over her

22-plus years of employment with the Town to cover all of her absences, at least through 2001.

---

[1] Crohn's disease, also known as regional enteritis, is a chronic illness that causes inflammation and ulceration in the digestive tract, most commonly in the lower small intestine or in the colon.

[2] The Town contends that Crevier and Ramsey were the only two employees in the Water Department at the time of Ramsey's appointment.  However, Crevier contends that there was another employee, "Mary," whom Crevier trained prior to her transfer to the Developmental Services Department.

[3] Crevier does not appear to dispute the Town's calculation of her absences.

At some point, she requested modification of her work schedule, so that she would only need to work two or three days a week.  In May 2001, the Town granted her some scheduling flexibility by allowing her "flextime" to permit her to attend medical appointments.[4]

Crevier had several conflicts with her supervisors during this period.  The Town confronted her in August 2000 about allegations that she was abusing her sick leave by using the time off to earn income from another source.[5]  Crevier says these allegations were false, and that the Town did not investigate them prior to accusing her of wrongdoing.  She was reprimanded in July 2001 for poor job performance related to billing.  Crevier contends that "Mary," another employee, was the employee responsible for the problem.  She was also reprimanded in September 2001 for using the Water Department fax machine on behalf of a teen support group.

By January 2002, she was running low on accumulated sick, personal, and vacation time.[6]  She then applied for unpaid absence under FMLA on at least two occasions: January 6 and September 25, 2002.[7]  She contends that she did not do so sooner because she was told by her supervisors at the Town that she was required to exhaust her paid leave before applying for

---

[4] At some point, apparently in 2001 or early 2002, Crevier was permitted to commute at different hours on Monday and (possibly) do some work at home.

[5] In an August 3, 2000 memorandum to Crevier, the Town Superintendent (Ramsey) notified her that the Town had received "complaints that you have engaged in employment during the time you are on paid sick leave . . ." and that if these complaints are true, it would constitute "a disciplinary offense."  With the memorandum, Ramsey sent Crevier a form on which she was to report any outside earnings.

[6] The Town contends that Crevier actually ran out of accumulated paid leave. The Town Sick Bank Committee also granted her some additional paid leave (24 hours according to Crevier, and 46.5 hours according to the Town).

[7] According to Crevier, she made other such requests in 2002.  An October 14, 2002 e-mail from Terenzini to Crevier indicates that she requested FMLA in February.  However, there appears to be some confusion as to whether subsequent submissions of information constituted additional FMLA requests (that is, a new request in addition to the January request) or merely supplemented the initial request with additional necessary information.

FMLA leave.[8]

Her first FMLA request was submitted on January 6, 2002, although she did not submit a physician's certification until February 25.  That certification indicated that the duration of the leave was "indefinite"; according to the Town, there was no assurance that she would ever be able to resume her normal duties.[9]  According to Crevier, the Town denied or ignored her request.

In May 2002, Crevier was transferred from the Water Department to the Developmental Services Department.  Her job responsibilities remained primarily clerical, and she maintained the same pay, rank, and hours.  The Town contends that the new position was a reasonable accommodation, in that it provided her with more job flexibility; specifically, she was permitted to work evenings to free up time for medical appointments during the day.  Crevier, however, disputes the contention that the new position afforded her any additional flexibility and that it was an accommodation.

The Town contends that Crevier never worked a full day at her new position in the Developmental Services Department.  According to the Town, she did not attempt to return to work until October 2002, at which point she had medical clearance only to work a two or three days per week.

The Town also contends that there was no one to do her work when she was absent, creating an undue hardship.  Crevier, however, asserts that the Town, readily could have, but

---

[8] The evidence supporting that contention is thin at best.  The first line of an October 14, 2002 e-mail from Terenzini to Crevier seems to imply that FMLA leave would not be granted in addition to paid leave ("FMLA is inclusive of all other leave time you might otherwise ahve [sic]. It is NOT and [sic] Add-on.")  Crevier does not, however, directly state in her affidavit that she was told that she was required to exhaust her paid leave before taking FMLA leave.

[9] She contends that she needed a 12-week medical leave in order to receive treatment that would improve her condition.  The physician's certification, however, does not so indicate.

refused to, let her do certain tasks from home.  She also says there were other people in the department capable of covering for her during her absences and that no essential work went unaccomplished.

On September 25, 2002, Crevier again requested FMLA leave, which Terenzini granted.[10] On October 3, Terenzini sent Crevier an e-mail, the meaning of which is disputed.  The Town contends that it merely confirmed Crevier still had unused paid sick leave; Crevier contends that it also revoked the September 25 FMLA approval as of October 10.  According to the Town, Crevier was not eligible for the 12 weeks of FMLA unpaid leave she requested because she had worked only 911.5 hours in the prior 12-month period, less than the 1250 hours that triggers FMLA eligibility.[11]

In early October 2002, a series of in-person, e-mail, and telephone communications took place between Crevier, Terenzini, and Ramsey about Crevier's attendance at work and her request for FMLA leave.

Crevier contends that on October 16, Terenzini fired her.  She was at work that day when she received a telephone call from Terenzini, who was out of the office.  He told her to leave the building immediately or he would call the police to escort her out.  However, it does not appear that any personnel action paperwork was processed as a direct result of that phone conversation, and that Crevier remained officially on the payroll for at least a few more weeks.

A few days after October 16, Terenzini told Crevier she could receive some specific

--------

[10] The physician's certification for this request was submitted on October 9.

[11] The Town contends that from January to October 2002, Crevier was absent for the equivalent of 20 weeks.  Crevier does not appear to dispute that calculation.

separation benefits from the Town if she signed a resignation agreement.[12]  However, when a memorandum of agreement was produced for her signature, the terms were different from those that had been discussed, and included a requirement that Crevier produce a physician's certification that she would be able to return to work full-time by November 25.  Crevier refused to sign the agreement, and instead sent a resignation letter to the Town on October 30.  She contends that the resignation was involuntary and that she was terminated because of her disability.

The Town disputes that Crevier was fired on October 16 or otherwise.  The Town further contends that the October 30 letter from Crevier constituted a voluntary resignation of her employment.

In early November 2002, Crevier sent a letter to the Town in which she amended her October 30 letter and described her separation as "retirement."  Although she was a few years short of eligibility for full retirement, she contends that she wrote the letter because she was in dire financial straits and needed the income that an early retirement would provide (resignation would have resulted in a forfeit of all benefits and future income from the Town).

After her separation from the Town, Crevier worked part time as a clown and as a massage therapist.  However, a later accident left her with leg and foot injuries that disabled her from working for some period.  After treatment for the injuries and further treatment for Crohn's disease, Crevier has been able to return to work full time, needing the cumulative equivalent of approximately one month per year of sick and vacation time.

---

[12] At some point in the fall of 2002, a Town official spoke to Crevier about the possibility of an early retirement package, which was being considered for several Town employees, not just for her. Shortly thereafter, Crevier was told the Town Board of Selectmen had voted down the proposal.

Crevier filed a complaint with the Massachusetts Commission Against Discrimination (MCAD) in 2003, alleging discrimination and FMLA violations.  In March 2005, she withdrew her case from MCAD.  She filed the present complaint on October 17, 2005, alleging that the Town (1) violated the ADA, Mass. Gen. Laws ch. 151B, and the Rehabilitation Act by failing to reasonably accommodate her disability (Counts 1, 3, and 8, respectively); (2) violated those statutes by retaliating against her because of her exercise of her rights (Counts 5 and 6); (3) violated the FMLA by failing to grant her leave for which she was eligible, interfering with her FMLA rights, and retaliating against her for attempting to exercise her FMLA rights (Counts 2 and 5); (4) violated her constitutional due process rights (Count 7); and (5) violated Massachusetts common law by wrongfully discharging her (Count 9).

## II.   Analysis

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990).

### A.   Failure to Accommodate under ADA and Chapter 151B (Counts 1 and 3)

Count 1 alleges a violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq.*, and Count 3 alleges a violation of its state law analogue, Mass. Gen. Laws ch.

7

151B, § 4.[13]

Under the ADA, an employer may not discriminate against a qualified individual with a disability.[14]  Discrimination includes, among other things, failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation" of its business.  42 U.S.C. § 12112; *see* Mass. Gen. Laws ch. 151B, § 4(16) (using largely identical language); *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 644, 648-49 & n.19 (2004).[15]

Unlike other discrimination claims, a failure to accommodate claim "does not require that an employer's action be motivated by a discriminatory animus directed at the disability."  *See Higgins v. New Balance Ath. Shoe, Inc.*, 194 F.3d 252, 264 (1st Cir. 1999).  Therefore, the three-part *McDonnell-Douglas* burden-shifting scheme usually employed in summary judgment discrimination analysis is "inapposite" for such claims.  *Id.*; *see McDonnell-Douglas Corp.*, 411 U.S. 792, 802 (1973).

To recover under a "failure to accommodate" theory, the plaintiff must show that (1) she

---

[13] Massachusetts discrimination laws are very similar to the ADA, and are generally afforded the same construction as the federal law.  *See Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 816 n.5 (Mass 1997).  Therefore, with respect to these claims, the Court will generally discuss federal law, and will address Massachusetts law only when it differs from federal law.

[14] Although Chapter 151B uses the term "handicap" instead of "disability," the two terms have essentially the same meaning for these purposes.  *See Ocean Spray*, 441 Mass. at 637 n.6.

[15] Failure to accommodate is not the only possible form of disability discrimination.  *See, e.g.,* 42 U.S.C. § 12112(a) (prohibiting discrimination regarding "job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").  Although the complaint hints at other theories of recovery, plaintiff has made no reference in her opposition papers to any theory other than a failure to accommodate.

has a disability; (2) she was "qualified," in that she was able to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the requested accommodation, at least on its face, was feasible for the employer under the circumstances and that despite knowing of plaintiff's alleged disability, the employer did not reasonably provide it. *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002); *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 257-60 (1st Cir. 2001).

### 1.     First Element:  Disability

"Disability" is defined by the ADA in part as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(2).  Crohn's disease is clearly a disability within the meaning of the ADA.  *See, e.g. Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998).  It is not disputed that her disease interfered with one or more major life activities.  *See, e.g.,* 28 C.F.R. § 36.104 ("Working" is a major life activity within the meaning of the statute.).  Thus, plaintiff qualifies as "disabled" within the meaning of the ADA.

### 2.     Second Element:  Qualification

A disabled person is "qualified" for a position if, "with or without reasonable accommodation, [such person] can perform the essential functions" of the job.  42 U.S.C. § 12111(8); *accord Garrity v. United Airlines, Inc.*, 421 Mass. 55, 61-62 (1995) (Chapter 151B).

EEOC regulations state that a job function is "essential" if it is a "fundamental job dut[y]" and not a "marginal function."  29 C.F.R. § 1630.2(n)(1).[16]  As noted, plaintiff was employed as

---

[16] A function may be "essential" if (1) "the position exists . . . to perform that function"; (2) there are a "limited number of employees available" who can perform the function; or (3) the function is highly specialized. *Id*. at § 1630.2(n)(2).  Evidence that a particular function is "essential" includes, but is not limited to, the

clerk/secretary with some customer service responsibilities.  Defendant strongly contends that plaintiff needed to be physically present at all times to perform the job.  Plaintiff disputes that assertion, as well as whether there were other people working in the office who could fill in for her when she was absent due to illness and whether some of her tasks could be adequately accomplished from home.  Plaintiff has thus established that there are genuine issues of fact in dispute, sufficient to defeat summary judgment on the question of whether she was able to meet the essential functions of her job, with or without reasonable accommodation.  *See Calero-Cerezo v. United States*, 355 F.3d 6, 22 (1st Cir. 2004) (reasonable fact-finder could conclude that plaintiff "while suffering the powerful effects of her disability, still possessed the ability to function competently and productively in the workplace, either without any modification of her work situation or with a reasonable accommodation."); *Labonte v. Hutchins & Wheeler*, 424 Mass. 813, 822 (1997).  The Court is aware, of course, that the record could also support a contrary finding.  It is not common that a position such as plaintiff's can be performed at home.  "An employer may base a decision that the employee cannot perform an essential function on an employee's actual limitations, even when those limitations result from a disability."  *Calef v. Gillette Co.*, 322 F.3d 75, 86 (1st Cir. 2003).  In the context of summary judgment, however, the Court, as it must, "respect[s] the role of the fact-finder to choose between alternative, reasonably supported inferences."  *Calero-Cerezo*, 355 F.3d at 13.

### 3.        Third Element:  Reasonable Accommodation

---

employer's judgment, written job descriptions, the amount of time spent performing the function, the consequences that flow from not requiring the plaintiff to perform the function, the terms of a collective bargaining agreement, the work experience of past job incumbents, and work experience of incumbents in similar jobs. *Id.* at 1630.2(n)(3).

A "reasonable accommodation" is a modification to the work environment, or to the way in which the job is performed, that would enable the person to perform the essential functions of the job or to enjoy equal benefits and privileges of employment.  29 C.F.R. 1630.2(o)*; accord Ocean Spray*, 441 Mass. 632, 648.  In general, an employer must only accommodate the limitations that flow from the disability that affect the employee in the workplace.  *See* 42 U.S.C. § 12112(b)(5); Mass. Gen. Laws ch. 151B, § 4(16); *Peebles v. Potter*, 354 F.3d 761, 768-69 (8th Cir. 2004).

Taking the record in the light most favorable to plaintiff, the Court assumes that the deficiencies in plaintiff's performance—primarily, her frequent absences—were the result of her Crohn's disease.  Therefore, as long as defendant had knowledge of her disability and was confronted with a request for accommodation, defendant was required to provide any accommodations that (1) would have addressed these deficiencies, (2) were reasonable, and (3) were not unduly burdensome to its business.  Limitations that result from a disability that affect the employee's performance of the essential functions of the job may have to be reasonably accommodated.

The parties do not dispute that plaintiff requested accommodations, such as medical leave, flexible working hours, and permission to accomplish some tasks from home.  Again, however, the parties do dispute whether these requests altered the essential functions of the job to the extent that providing the accommodations requested would have imposed an undue burden on defendant.[17]

---

[17] An employer need not modify an essential function of the job as an accommodation.  *Calef*, 322 F.3d at 86 n.8.

11

Defendant contends that when plaintiff missed work, there was no one else physically assigned to the office who could fill in for her. Plaintiff, however, asserts that there were others working in the office. She also contends that it would have imposed no hardship at all on defendant to allow her to, for example, type up meeting minutes from home rather than at the office (an accommodation that she requested but was denied). In short, plaintiff has established a genuine issue of material fact as to whether her requested accommodations were facially feasible. Accordingly, the Court will deny defendants' motion for summary judgment on the claims based on failure to accommodate.

### B.      Interference with Rights Under FMLA (Count 2)

Count 2 alleges a violation of plaintiff's rights under FMLA. Under FMLA, "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Any employee who takes such a leave "shall be entitled, on return from such leave—(A) to be restored by the employer to the [previous] position . . . or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(A), (B); *see also Watkins v. J & S Oil Co., Inc.*, 164 F.3d 55, 59 (1st Cir. 1998).

FMLA contains two distinct types of rights—"prescriptive" rights and "proscriptive" rights. *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 159-60 (1st Cir. 1998).[18] When

---

[18] Under FMLA, eligible employees "shall be entitled" to up to twelve workweeks of unpaid leave, either continuous or intermittent, per year when the employee has "a serious health condition that makes [him or her] unable to perform the functions of [his or her] position," to care for a close family member with such a condition, or because of the birth, adoption, or placement in foster care of a child. *See* 29 U.S.C. § 2612(a)(1) & (b); 29 C.F.R. § 825.117. The employee is also "entitled to return to the same position or an alternate position with

prescriptive rights are in controversy, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Id.* at 159.  "Because the issue is a right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." *Id.*

FMLA also provides protection against interference with those rights and discrimination for exercising those rights. *Id.* at 159-60 (*citing* 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220).  The First Circuit has describes these provisions as being "proscriptive." *Hodgens*, 144 F.3d at 160.  Plaintiff has alleged two different violations of her proscriptive rights:  a failure to respond properly to her requests for leave (alleged in Count 2) and retaliation for exercise of her FMLA leave (alleged in Count 5).  The retaliation claim is addressed in a separate section of this memorandum.

### 1.    <u>Prescriptive Rights</u>

Plaintiff made her first formal request for leave under FMLA in January 2002, and contends that she made several other such requests between January and October 2002.[19]   It appears that defendant never formally granted plaintiff leave under FMLA.[20]  Defendant does not

---

equivalent pay, benefits, and working conditions, and without loss of accrued seniority." *Hodgens*, 144 F.3d at 159 (*citing* 29 U.S.C. § 2614(a)(1); 29 C.F.R. § 825.100(c).  According to the First Circuit, "[t]hese rights are essentially prescriptive, 'set[ting] substantive floors' for conduct by employers, and creating 'entitlements' for employees." *Hodgens*, 144 F.3d at 159.

[19] However, as mentioned above, there seems to be some confusion as to whether certain documentation submitted by Crevier during 2002 constituted new FMLA requests, or whether they were simply additional information that the Town required in order to complete the initial request.

[20] The record is not entirely clear on this point.  It seems that the defendant may have retroactively granted one or two weeks of FMLA leave in 2002, when Crevier was absent for several weeks due to medical treatment and ran out of paid leave before the end of her absence.

dispute that it is an employer subject to FMLA, but disputes plaintiff's eligibility for FMLA leave.

Among other requirements, to be eligible for FMLA leave, an employee must have worked at least 1250 hours in the past year for the employer from whom such leave is requested. *See* 29 C.F.R. § 825.110.  The employee satisfies that requirement only if those 1250 work hours are spent in productive labor at the employer's behest, and the employee is compensated by the employer for that time.  *See* 29 U.S.C. § 207(e).  Thus, an employee is not eligible simply because the employer pays her for more than 1250 hours of work, if the payment is for a combination of (1) less than 1250 hours of actual work plus (2) some hours of earned, paid, leave.  In other words, paid vacation or sick time does not count towards satisfaction of the 1250-hour threshold. *See Plumley v. Southern Container, Inc.*, 303 F.3d 364, 370 (1st Cir 2002).  Whether the employee meets the 1250-hour requirement is to be computed from the date that the employee requests FMLA leave, not from the date of the employer's rejection of the request or from the date of any retaliatory action taken by the employer in response to the request.  *See Duckworth v. Pratt & Whitney, Inc.*, 152 F.3d 1, 8 (1st Cir. 1998).

Defendant contends that when plaintiff requested FMLA leave in early October 2002, she was ineligible because she had not worked at least 1250 hours within the past year.  Plaintiff contends that the October 2002 request was preceded by several others, including one in January 2002.  Defendant does not contend that plaintiff was ineligible at the time of the January 2002 request.  If defendant is to be believed that in 2001 plaintiff took the equivalent of 10 weeks of leave (and therefore worked 32 hours per week for the remaining 42 weeks of the year), then she would have worked 1344 hours in 2001, satisfying the eligibility requirement for FMLA leave. Thus, there is sufficient evidence in the record to allow a jury to determine if plaintiff was eligible

14

for leave at the time of one or more of her FMLA requests.  Accordingly, summary judgment will be denied as to the prescriptive claims under the FMLA.

### 2.  **Proscriptive Rights**

FMLA makes it unlawful for anyone to "interfere with, restrain, or deny" an employee's exercise, or attempt to exercise, her FMLA rights.  *See* 29 U.S.C. § 2615(a).  Plaintiff alleges that defendant interfered with her attempts to exercise her right to FMLA leave by failing to respond to her requests for FMLA leave and erroneously advising her that she could not take FMLA leave until her earned leave was exhausted.

Specifically, plaintiff contends that each of her FMLA leave requests was either ignored or denied by defendant.  She further contends that she was erroneously advised by defendant that she could not take FMLA leave until she had exhausted her paid leave options.  Thus, plaintiff complains that defendant tricked her into taking additional paid leave before making subsequent FMLA leave requests, because the taking of the paid leave made her ineligible for certain FMLA leave (due to the 1250-hour work requirement).

Employers are required to notify employees of their FMLA rights and respond promptly to employee questions about FMLA leave applicability and procedures.  *See* 29 C.F.R. §§ 825.301(c)(1) and (d).  An employer's failure to explain FMLA procedures properly and accurately can "constitute interference with an employee's FMLA rights if it causes the employee to forfeit FMLA protections."  *See LaCoparra v. Pergament Home Ctrs., Inc.*, 982 F. Supp. 213, 220 (S.D. N.Y. 1997).  *See also Dressler v. Community Serv. Communs.*, 275 F. Supp. 2d 17, 23 (D. Me. 2003); *Dodgens v. Kent Mfg. Co.*, 955 F. Supp. 560, 564 (D.S.C. 1997).

Accordingly, summary judgment will be denied as to the proscriptive claims in Count 2.

15

**C.    Retaliation under ADA, Chapter 151B, and FMLA (Counts 5 and 6)**

Count 5 alleges that defendant retaliated against her in violation of the ADA and FMLA.

Count 6 makes a similar allegation under chapter 151B.  Both the ADA and chapter 151B make it

unlawful for employers to retaliate against persons who complain about unlawfully discriminatory

employment practices.  *See* 42 U.S.C. § 12203(a); Mass. Gen. Laws ch. 151B, § 4; *Noviello v.

City of Boston*, 398 F.3d 76, 88 (1st Cir 2005).[21]  FMLA contains a similar provision.  *See* 29

U.S.C. § 2615(a)(2) (making it unlawful for an employer "to discharge or in any other manner

discriminate against any individual" for exercising his or her right to FMLA leave or opposing any

unlawful practice under FMLA).

Defendant has moved for summary judgment on statute of limitations grounds only as to

Counts 5 and 6, and then only as to the ADA and chapter 151B claims (but not the FMLA

claims).  The Court will turn to that issue first.

**1.    Statute of Limitations**

In order to recover on a theory of retaliation, plaintiff must prove that the defendant took

adverse employment action against her.  *See Blackie v. Maine*, 75 F.3d 716, 725-26 (1st Cir.

1996) (for a retaliatory employment action to be adverse, "the employer must either (1) take

---

[21]  Section 12203(a) provides as follows:

No person shall discriminate against any individual because such individual has opposed any act
or practice made unlawful by this Act or because such individual made a charge, testified,
assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act.

Chapter 151B, § 4 provides:

It shall be an unlawful practice . . . (4) For any person, employer, labor organization or
employment agency to discharge, expel or otherwise discriminate against any person because he
has opposed any practices forbidden under this chapter or because he has filed a complaint,
testified or assisted in any proceeding under section five.

16

something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service") (citations omitted); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662 (1996) (to establish a retaliatory adverse employment action, there must be "change in working conditions which materially disadvantaged [plaintiff]").  Here, the plaintiff's action alleging unlawful retaliation in violation of the ADA or chapter 151B must be brought within three years of the alleged retaliatory event.  *See* 42 U.S.C. § 2000e-(e) and Mass. Gen. Laws ch. 151B § 9.

Plaintiff here contends that she suffered from four adverse employment actions in retaliation for the exercise of her rights under the ADA and chapter 151B:  (1) she was falsely accused in August 2000 of abusing her sick leave; (2) she was falsely accused in June 2001 of creating a billing problem (and possibly reprimanded); (3) she was reprimanded in September 2001 for using the fax machine; and (4) she was fired (on October 16) or constructively discharged (on October 30), 2002.[22]

---

[22] Plaintiff alleges, inconsistently, both that she was fired on October 16 and that she was constructively discharged on October 30.  To establish a "constructive discharge," the plaintiff must show that she suffered working conditions so intolerable that a reasonable person in her position would have felt compelled to resign. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-47 (2004); *Hill v. Principi*, 439 F.3d 18, 27 (1st Cir. 2006) (motion for a new trial denied where a jury could have found that plaintiff's treatment was not "objectively intolerable").  That is, "[i]n order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *GTE Products Corp. v. Stewart*, 421 Mass. 22, 34-35 (1995) (citation omitted).  A constructive discharge is not synonymous with discriminatory harassment, which requires only that the harassment be so severe or pervasive that a reasonable person would have felt that his or her working conditions were altered. *See Pennsylvania State Police*, 542 U.S. at 146-47.

The complaint in this action was filed on October 17, 2005.[23]  Although defendant denies that plaintiff was fired or constructively discharged, there is no question that any claim she may have arising out of the events of October 16-30, 2002, is timely.

Plaintiff's claims arising out of the earlier three events are more problematic.  Plaintiff appears to acknowledge that more than three years elapsed between the adverse employment action (if any) and the filing of the complaint.  She contends, however, that any claims arising out of those events are actionable under the "continuing violation" doctrine.

The concept of a "continuing violation" allows plaintiffs to succeed on otherwise time-barred claims in recognition of the fact that sometimes, a plaintiff "may be unable to appreciate that he is being discriminated against until he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern."  *O'Rourke v. City of Providence*, 235 F.3d 713, 732 (1st Cir. 2001).  Plaintiff contends that the incidents prior to October 2002 were part of a continuing pattern of violation of her rights that culminated in her termination.

The First Circuit has identified several criteria to be used to evaluate the sufficiency of a "continuing violation" claim:  (1) whether the subject matter of the discriminatory acts was sufficiently similar such that there was a substantial relationship between the otherwise untimely acts and the timely acts;[24] (2) whether the acts were isolated and discrete or occurred with

---

[23] October 17 was a Monday.  When the limitations period expires on a Saturday, Sunday, or federal holiday, the plaintiff is granted until the next federal work day in order to file the complaint.  Thus, giving plaintiff the benefit of the doubt, and assuming she would have filed on October 15 or 16 if possible, her filing on October 17 is a timely filing for all claims accruing on or after October 15, 2002.

[24] *See also, e.g., Marcano-Rivera v. Pueblo Int'l, Inc.*, 232 F.3d 245, 256 (1st Cir. 2000) (failure to accommodate case where each alleged incident occurring outside the statute of limitations was similar in nature to those occurring within the statute of limitations); and *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 401-402 (1st Cir. 1990) (plaintiff has the burden to show a substantial relationship between incidents otherwise barred by the statute of limitations and those within the statute of limitations).

18

frequency or repetitively or continuously; and (3) whether the acts were of sufficient permanence that they should have triggered an awareness of the need to assert one's rights.  *See O'Rourke*, 235 F.3d at 731.

The "continuing violation" doctrine does not apply if, at any point prior to the limitations period, plaintiff was or should have been aware of the discriminatory practice.  *Sabree v. United Bhd. of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 401 (1st Cir. 1990).  Obviously, it does not apply if the plaintiff admits that at the time she knew that she was the victim of discrimination.  *Id* at 401-402.

Here, plaintiff had received ample indications well prior to October 16, 2002, that she potentially was the subject of disability discrimination.  By May 2002, by her own account, she had been falsely accused and/or reprimanded on three occasions, wrongly deprived of leave on multiple occasions, transferred to a different department, and wrongly deprived of flexible working hours.  Those facts clearly should have triggered an awareness of the need to assert her rights.

In short, plaintiff cannot avail herself of the "continuing violation" doctrine.  To the extent plaintiff's retaliation claim under the ADA or chapter 151B seeks damages for adverse employment actions occurring prior to October 15, 2002, it is time-barred.  The claim arising out of her discharge, however, is timely.

Accordingly, the Court will grant defendant's motion for summary judgment as to ADA and chapter 151B claims based on adverse employment actions occurring prior to October 15,

2002, and otherwise denies it.[25]

### 2.  Retaliation under ADA and Chapter 151B

In order to withstand summary judgment on a claim of retaliation under the ADA or chapter 151B, a plaintiff must first establish a *prima facie* case.  To do so, she must show (1) that she engaged in protected activity, (2) that she suffered an adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment action. *See Noviello*, 398 F.3d at 88, citing *Dressler v. Daniel*, 315 F.3d 75, 78 (1st Cir. 2003) (Title VII) and *Sullivan v. Raytheon Co.*, 262 F.3d 41, 48 (1st Cir. 2001) (chapter 151B).

As noted, the first requirement of a retaliation claim is that the plaintiff engaged in protected conduct.  *See Noviello*, 398 F.3d at 88.  The conduct protected by the statue includes (1) opposing any discriminatory act or practice, and (2) making a charge, testifying, assisting, or participating in an investigation, proceeding, or hearing under these laws.  *See* 42 U.S.C. § 12203(a).  Requesting an accommodation does not obviously fall within the statutory requirements of protected conduct.  However, it seems unlikely that Congress intended to prevent employees who request an accommodation, and then are immediately terminated, from filing a retaliation claim, simply because they did not have time to complain about their employer's failure to accommodate before they were fired.  *See Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).  Therefore, the Court is prepared to assume that making a request for an accommodation is protected conduct within the meaning of the ADA's prohibition on retaliation. *Id*.

---

[25] The Court is not, of course, ruling that evidence of events occurring prior to October 15, 2002, is necessarily inadmissible.

This creates a potential difficulty in analyzing the summary judgment claims.  The

*McDonnell-Douglas* burden-shifting framework generally applies to both discrimination and

retaliation claims under the ADA.  *See, e.g., New Eng. Health Care Emples. Union v. R.I. Legal

Servs.*, 273 F.3d 425, 429 (1st Cir. 2001).  However, that framework does not apply to an ADA

discrimination claim when the alleged form of the discrimination is a failure to accommodate.  *See

Higgins*, 194 F.3d at 264.  It is not clear whether the framework would apply to an ADA

retaliation claim where the alleged protected conduct is a request for an accommodation.

The Court need not, however, decide the issue, because plaintiff here fails to satisfy the

third prong of the *prima facie* case for retaliation:  that there was a causal connection between the

protected activity and the adverse employment action.

As discussed above, plaintiff complains of several adverse employment actions, including

unfounded accusations (of misuse of sick leave), unfair reprimands (for poor performance and

improper fax machine use), and constructive (or actual) termination.  However, the three-year

statute of limitations bars claims of discrimination or retaliation under the ADA for events

occurring prior to October 15, 2002.  Therefore, the only adverse employment action that can be

considered for the purposes of the retaliation claim is plaintiff's claimed actual or constructive

discharge, which she contends occurred either on October 16 or October 30, 2002.

Plaintiff's requests for accommodation (as opposed to her requests for FMLA leave) did

not occur in close temporal proximity to October 2002.  Those requests—which included a more

flexible work schedule, not having to commute home during Monday evening dinner hour, and

being able to complete some work from home—occurred in 2000, 2001, and possibly as late as

early 2002.  Several of these requests were accommodated for at least some period of time.

There is no evidence that she made any such requests at any time close to what she contends was her actual or constructive termination in October 2002.  Therefore, plaintiff has failed to establish a causal connection between her requests for accommodation and the only adverse employment action upon which she could base an ADA retaliation claim.

Accordingly, summary judgment will be granted as to plaintiff's retaliation claims under the ADA and Mass. Gen. Laws ch. 151B.

### 3.      Retaliation Claim under FMLA

As with an ADA retaliation claim, a motion for summary judgment as to a FMLA retaliation claim must be analyzed under the tripartite burden-shifting analysis of *McDonnell Douglas*, 411 U.S. at 800-806.  *See Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 335-336 (1st Cir. 2005).  *See also Keeler v. Putnam Fiduciary Trust Co.*, 238 F.3d 5, 8-9 (1st Cir. 2001) and *Hodgens*, 144 F.3d at 160.

### a.      *Prima Facie* Case of Retaliation

To make out a *prima facie* case for FMLA retaliation, "plaintiff must show (1) that [she] engaged in a protected action (here, requesting or taking FMLA leave); (2) that [she] suffered an adverse employment action (here, being fired); and (3) that there was some possibility of a causal connection between the employee's protected activity and the employer's adverse employment action, in that the two were not wholly unrelated." *See Colburn*, 429 F.3d at 336 n. 10.  *See also Hodgens*, 144 F.3d at 161.

First, according to plaintiff, she requested FMLA leave on at least two occasions in

2002.[26]  Although that issue is disputed, plaintiff has proffered sufficient evidence to establish that she exercised her FMLA rights.

Second, plaintiff contends that she suffered an adverse employment action in October 2002 (her actual or constructive discharge), as well as several earlier adverse actions (such as her reprimand for using the fax machine).[27]  Again, while those facts are disputed, plaintiff has submitted sufficient evidence to establish this element.

Finally, plaintiff must show that the adverse employment actions were taken against her *because* she attempted to exercise a right protected by the FMLA.  In general, that burden is "quite easy to meet."  *Hodgens,* 144 F.3d at 165-66 (internal citations omitted).  Plaintiff contends that her schedule flexibility (a previously granted accommodation) was revoked shortly after she requested leave in January 2002.  She also points out that the October 16, 2002 phone call—in which, she alleges, she was fired—occurred only two weeks after her final FMLA request.  *See id.* at 168-69 ("close temporal proximity between two events may give rise to an inference of causal connection"); *but see Dodgens v. Kent Mfg. Co.*, 955 F. Supp. 560, 566 (D.S.C. 1997) (no causal connection established where employer had granted hundreds of other leaves of absence over the years).

---

[26] FMLA protects leaves of absence where (1) the employee had a serious health condition; (2) because of that serious health condition, the employee was unable to perform the functions of his or her job; and (3) the employee furnished adequate notice to his or her employer of his or her need and intention to take leave under the FMLA.  29 U.S.C. § 2612(a)(1)(D), (e)(2)(B).

As discussed above, Crohn's disease is recognized as a serious health condition for purposes of the ADA and the FMLA.  Plaintiff has also offered evidence that some of her Crohn's disease "flare-ups" were debilitating (including severe fatigue and indigestion, among other things), temporarily preventing her from performing the functions of her job.

[27] Defendant does not contend that the FMLA retaliation claim, as opposed to the ADA and chapter 151B claims, is time-barred.

23

A jury could reasonably find that the revocation of her schedule flexibility, and her termination, were directly related to her requests for FMLA leave.  Thus, plaintiff has proffered sufficient evidence to establish a *prima facie* case of FMLA retaliation.

### b.      Whether Defendant Has Provided a Legitimate, Non-Discriminatory Reason for Its Decision

In order to rebut the presumption that arises upon the establishment of a *prima facie* case, an employer must produce evidence sufficient to permit a rational fact-finder to conclude that the termination decision was made for a legitimate reason.  *See Hodgens*, 144 F.3d at 166-67.

Defendant first contends that it cannot be guilty of retaliating against plaintiff for her attempt to exercise her FMLA rights because she was not eligible for FMLA leave.  Defendant also points to a physician's note produced by plaintiff in the fall of 2002 that states that her medical condition would only permit her to work two or three days per week.  Defendant contends that regular attendance was one of plaintiff's essential job functions, and that accommodating such irregular and limited attendance for an indefinite time would constitute an undue hardship on defendant, and thus defendant was justified in scaling back the schedule flexibility it had previously granted.  Defendant further contends that it did not terminate plaintiff, but that she voluntarily resigned.[28]

All of those facts are dispute.  A rational jury could, however, conclude that defendant had a valid, non-retaliatory reason for any adverse employment actions taken against plaintiff.  Thus, defendant has met its burden of establishing a non-discriminatory reason for any adverse employment actions.

---

[28] Defendant also contends that it had adequate reason to reprimand her for the fax machine and billing incidents.

### c.    Whether Plaintiff Has Established That the Stated Reason Is Pretextual

The issue then becomes whether the employer's stated reason for termination is pretextual.  Plaintiff contends that defendant is intentionally misconstruing the physician's note. She contends that if granted FMLA leave in the fall of 2002, she would have been able to undergo intensive treatment for her Crohn's disease, and that after her leave she would have been able to work closer to a full-time schedule.  In the October 9, 2002 physician certification accompanying the September 25 FMLA leave request, her doctor estimated that she would only be capable of working two or three days per week at most.

Again, the facts underlying this issue are very much in dispute.  Furthermore, because this issue involves elusive questions of motive and intent, courts should be cautious in granting an employer's motion for summary judgment when a case comes down to such a determination. *Hodgens*, 144 F.3d at 167.  Accordingly, defendant's motion for summary judgment on plaintiff's FMLA retaliation claims will be denied.

### D.    Count 7:  42 U.S.C. § 1983

Count 7 alleges that defendant violated her Fourteenth Amendment rights by depriving her of property (her employment with the Town) without due process of law.  Defendant contends that plaintiff was an at-will employee, and therefore had no constitutionally-protected property interest in her employment.  Plaintiff does not dispute that contention or offer any evidence to the contrary.  Instead, she now contends that defendant violated her due process rights by failing to provide a hearing so that she could clear her name after defendant defamed her with accusations

of wrongdoing.[29]

Damage to reputation, alone, is not a deprivation of a liberty or property interest sufficient to invoke the protections of the Due Process Clause of the Fourteenth Amendment. *See Silva v. Worden*, 130 F.3d 26, 32 (1st Cir. 1997). Government-inflicted harm to reputation must be extremely serious for the right to a hearing to attach. *Id.* at 33.

For an employee to succeed in a due process claim against a government-entity employer for defamatory statements, she must establish the following:

> First, the alleged statements must level a charge against the employee that might seriously damage his standing and associations in his community and place his good name, reputation, honor, or integrity . . . at stake. Statements merely indicating the employee's improper or inadequate performance, incompetence, or neglect of duty are not sufficiently serious to trigger the liberty interest protected by the Constitution.
>
> Second, the employee must dispute the charges made against him as false.
>
> Third, the stigmatizing statements or charges must have been intentionally publicized by the government. That is, the defamatory charges must have been aired in a formal setting (and not merely the result of unauthorized leaks).
>
> Fourth, the stigmatizing statements must have been made in conjunction with an alteration of the employee's legal status, such as the termination of his employment.
>
> Finally, the government must have failed to comply with the employee's request for an adequate name-clearing opportunity.

*See Wojcik v. Massachusetts State Lottery Comm'n*, 300 F.3d 92, 103 (1st Cir. 2002) (internal

---

[29] Plaintiff complains of the following defamatory acts by defendant: (1) the August 2000 letter from Ramsey concerning her alleged participation in outside employment during her sick leave (the Town Administrator and the Commissioners were sent copies of the letter); (2) the July 2001 "public" reprimand of plaintiff for the billing problem; and (3) a December 19, 2001 report on a hearing about a letter of warning put in plaintiff's employee file about the fax machine incident. Plaintiff also complains that her inability to get a letter of recommendation from defendant (her long-time employer) has hurt her ability to get another job.

citations omitted).

It is not necessary to analyze each of the alleged defamatory statements with respect to each of these five factors, because all fail to satisfy the fourth and fifth factors.  None of these statements occurred contemporaneously with a change in plaintiff's employment status.  Furthermore, plaintiff has not presented any evidence that she requested a name-clearing hearing that defendant refused to provide.[30]

Plaintiff also contends (for the first time, in opposing summary judgment) that defendant violated her First Amendment right to free speech by prohibiting her from using the fax machine for a public interest purpose (the teen support group).

"[T]he First Amendment does not guarantee access to property simply because it is owned or controlled by the government."  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983).  A fax machine in a municipal office is not normally a public forum that is open to the public, in the same manner as parks and sidewalks, for public expression.  Plaintiff has presented no evidence to indicate that the Town designated its fax machine as a public forum or permitted public access to its fax machine for public expression, speech, or press purposes.  When government property is not a public forum (by its nature or designation), the government may place restrictions on the use of that property for public speech, as long as the restrictions are not meant to suppress a particular viewpoint.  *Id*.  Plaintiff has presented no evidence that she was

---

[30] Plaintiff cannot satisfy the test in other respects as well.  First, although the 2000 written accusation of improper use of sick leave may have called her honor and integrity into question, plaintiff has not produced any evidence that it was intentionally made public in any kind of formal setting.  Second, the 2001 reprimand for improper billing was an accusation of incompetence, which fails to satisfy the requirement that the statement be an attack on the plaintiff's reputation, honor, or integrity.  The warning for improper use of the Town fax machine likewise did not attack plaintiff's honor or integrity.

prevented from using the fax machine in furtherance of a teen support group because Town officials wanted to suppress views expressed in the message that she disseminated.

Accordingly, defendant's motion for summary judgment will be granted with respect to plaintiff's claims under 42 U.S.C. § 1983.

### E.      Count 8:  Rehabilitation Act

Count 8 alleges that defendant violated plaintiff's employment rights under the Rehabilitation Act by failing to provide reasonable accommodations and by terminating her employment for discriminatory reasons.  Two sets of federal laws govern disability discrimination: the ADA, which applies to private employers with more than 15 employees and state and local governments, and the Rehabilitation Act, 29 U.S.C. § 794, which applies to federal agencies, contractors, and recipients of federal financial assistance.[31]  Plaintiff has sued under both.

Because the same substantive standards apply to claims filed under the ADA and the Rehabilitation Act, including the definitions of "disability" and "qualified individual," the case law construing the two statutes is essentially interchangeable.  *Calero-Cerezo*, 355 F.3d at 19.  The difference lies in the applicability.  Only federal employers, or employers that receive financial assistance from the federal government, are subject to the Rehabilitation Act.  Defendant notes that plaintiff has not presented any evidence that defendant receives federal financial assistance. In her response, plaintiff asks the Court to take judicial notice of fact that the Town receives

---

[31] The Rehabilitation Act states that

> [n]o otherwise qualified individual with a disability in the United States, as defined in
> [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from
> the participation in, be denied the benefits of, or be subjected to discrimination under
> any program or activity receiving Federal financial assistance.  *See* 29 U.S.C. § 794(a).

28

federal financial assistance, because it is "widely known" that all municipalities receive financial assistance from their states which the states ultimately receive from the federal government.

It is highly doubtful whether the Rehabilitation Act applies to municipalities (or their sub-entities) where those sub-entities do not receive *direct* federal financial assistance. *See Bentley v. Cleveland County Bd. of County Comm'rs*, 41 F.3d 600, 603 (10th Cir. 1994) (the Rehabilitation Act requires "a sufficient nexus between the federal funds and the discriminatory practice"); *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir. 1991) (the Rehabilitation Act was not "intended to sweep in the whole state or local government, so that if two little crannies . . . of one city agency . . . discriminate, the entire city government is in jeopardy of losing its federal financial assistance"); *Bacon v. City of Richmond*, 475 F.3d 633, 645 (4th Cir. 2007).

However, this Court need not resolve the issue.  In her complaint, plaintiff does not even allege that the Town or any of its sub-entities receive federal financial assistance, and she has offered no evidence to support that proposition.  *See McDonald v. Massachusetts*, 901 F. Supp. 471, 473 (D. Mass. 1995) (dismissing a Rehabilitation Act claim where the plaintiff failed to assert in the complaint (or provide any evidence to support the idea) that the defendant received federal financial assistance).  Accordingly, the Court will grant defendant's motion for summary judgment as to the Rehabilitation Act claims.

## F.    Count 9:  Wrongful Discharge

Finally, Count 9 alleges that defendant violated Massachusetts common law by violating its duty of good faith and fair dealing in employment contracts.

Massachusetts recognizes a common-law claim for wrongful discharge of at-will employees who are terminated for exercising their rights or for refusing to obey the employer's

29

instructions to violate public policy.  *See Mello v. Stop & Shop Cos., Inc.*, 402 Mass. 555, 557 (1988).  For example, an employee who refused an employer's instruction to violate a state law, and was subsequently fired, would have a common-law wrongful-termination claim.  However, where the employee is terminated for exercising her statutory right, and the statute provides the employee with a statutory remedy for that type of retaliatory termination, the statutory remedy preempts the common-law wrongful-discharge claim.  *See King v. Driscoll*, 418 Mass. 576, 584 n.7 (1994); *Mello*, 402 Mass. at 557.

In this case, plaintiff does not contend that she was fired for refusing to follow employer instructions to violate public policy.  Rather, she contends she was fired in retaliation for exercising her statutory rights under the ADA, the FMLA, and chapter 151B.  Each of those statutes provides employees with a statutory remedy, and plaintiff has made claims under those statutes in the complaint in this case.  Plaintiff is therefore barred from also asserting a common-law wrongful-termination claim under Massachusetts law.[32]

Accordingly, the defendant's motion for summary judgment will be granted as to the wrongful termination claim.

## III.   Conclusion

For the foregoing reasons, defendant's motion to for summary judgment is GRANTED as to counts 6, 7, 8, and 9; DENIED as to count 2; and GRANTED in part and DENIED in part as to counts 1, 3, and 5. With respect to counts 1, 3, and 5 all ADA and Mass. Gen. Laws ch. 151B

---

[32] In her response to defendant's motion for summary judgment, plaintiff's discussion of Count 9 abandons any claim of wrongful discharge under Massachusetts common law, and instead asks the Court to recognize a new claim for harassment that rose to the level of constructive discharge under federal law.  Because Count 2 already encompasses claims of FMLA interference and retaliation (including harassment and discharge), and because this issue was not raised until now, the Court is not inclined to entertain this request.

retaliation claims, and all discrimination claims arising out of events prior to October 15, 2002,

are dismissed.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated:  September 26, 2008